

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

August 12, 2025

<u>VIA ECF</u>
The Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   **Re:** *United States v. Nicole Torres*, **24 Cr. 499 (MKV)**

Dear Judge Vyskocil:

   The Government respectfully submits this letter in advance of the sentencing of defendant Nicole Torres in the above-referenced matter, which is currently scheduled for August 19, 2025. For the reasons set forth below, the Government respectfully submits that a sentence of imprisonment at the bottom of the applicable U.S. Sentencing Guidelines (the "Guidelines") range of 70 to 87 months would be sufficient but not greater than necessary to serve the purposes of sentencing.

### I. Background

#### A. Overview

   From 2019 through at least August 2024, the defendant was a district leader for a political party for the 81st assembly district in the Bronx. Bronx County covers 11 assembly districts, and each assembly district generally has two district leaders for each major political party. District leaders are unpaid elected officials who serve two-year terms. District leaders help run the political party within each county, and one of the district leaders' primary responsibilities is the selection and placement of poll workers for upcoming elections. (PSR ¶ 16).[1]

   From 2016 through 2024, the defendant also worked at the Bronx County office of the New York City Board of Elections ("NYC-BOE"), including, at times, in the poll worker department. The poll worker department is responsible for, among other things, paying poll workers, processing poll worker applications, and assigning poll workers to polling sites. (PSR ¶ 17).

   As described in further detail below, from at least 2018 through August 2024, the defendant abused her position as a district leader and an employee of the NYC-BOE in two ways. *First*, the defendant conspired with others, including other district leaders and poll workers, to require Bronx

---

[1] "PSR" refers to the Presentence Investigation Report of the United States Probation Office, dated July 18, 2025 (Dkt. 40); "Def. Mem." refers to the defendant's sentencing submission, dated August 5, 2025 (Dkt. 41).

residents to pay $150 to the defendant or a local organization (the "Bronx Organization") in order to be a poll worker, including during early voting.  *Second*, the defendant conspired with others, including poll workers, to sign up individuals for "no show" poll worker positions and then to fraudulently collect the salaries of those "no show" poll workers.

### B.  The Roles of Poll Workers and Coordinators

There are two ways to become a poll worker in the Bronx.  First, an individual can apply directly through the NYC-BOE by filling out an application.  After applying, poll workers must complete a training class, for which they generally get paid approximately $100.  After a poll worker has completed the class, the poll worker is eligible to become a poll worker for an upcoming election.  When there is an upcoming election, an employee in the poll worker department at the NYC-BOE calls poll workers to find out their availability for upcoming elections.  Second, district leaders can recommend to the NYC-BOE that an individual become a poll worker.  A poll worker who is recommended by a district leader fills out a different application but is still required to complete a training class.  Poll workers who are recommended by district leaders have priority for poll worker spots in upcoming elections.  After those poll workers are assigned spots, the other poll workers are assigned through a lottery system.  (PSR ¶ 18).

Each polling site has two coordinators (one for each major political party).  Coordinators oversee polling sites and take attendance.  When poll workers arrive at a polling site, they must sign an Election District book.  Poll workers get paid via direct deposit or check.  Poll workers are paid $250 a day, and coordinators are paid $350 a day.  The amount of money that poll workers and coordinators can earn each election has increased dramatically since New York City introduced early voting in October 2019.  Now, if a poll worker works all nine days of early voting and election day, they also can get a bonus of $25 per day worked, for a total of up to $2,750 each election cycle.  A coordinator can get a bonus of $50 per day worked.  Election day poll workers are also eligible for a bonus if they work at least two elections in a year.  (PSR ¶¶ 19-20).

### C.  The Poll Worker Kickback Scheme

From at least 2019 through at least August 2024, the defendant required at least 100 individuals to pay a $150 bribe either to herself or to the Bronx Organization, in order for that individual to be permitted to work as a poll worker.  The defendant both personally required poll workers to make this payment and worked with others to impose this requirement. (PSR ¶¶ 21, 37).

Below are examples of Bronx residents who the defendant required to pay $150 bribes in order to work as poll workers.

*Poll Worker-1*

One poll worker ("Poll Worker-1") first became a poll worker in 2015.  Poll Worker-1 works part-time and supplements Poll Worker-1's income through the poll worker salary.  In 2019, Poll Worker-1's then-district leader was upset and told Poll Worker-1 that the defendant had ordered both Poll Worker-1's then-district leader and Poll Worker-1 to pay $150 in order for Poll Worker-1 to work as a poll worker.  The defendant then called Poll Worker-1 directly and told

Poll Worker-1 that Poll Worker-1 had to pay a "divvy" to work in the upcoming elections. Poll Worker-1 understood the term "divvy" to refer to a $150 payment to the Bronx Organization. Poll Worker-1 had never previously been required to make any payment to be a poll worker; but, because Poll Worker-1 wanted to work, Poll Worker-1 agreed to pay the "divvy." Poll Worker-1 ultimately declined to pay the "divvy," though. And when that happened, Poll Worker-1 suffered the consequences: the defendant refused to let Poll Worker-1 work in two elections. (PSR ¶ 22).

*Poll Worker-2*

Another poll worker ("Poll Worker-2") is otherwise unemployed but has been a poll worker since in or around 2008. Poll Worker-2 reported that, in or around June 2020, the defendant told Poll Worker-2 that Poll Worker-2 had to pay what the defendant characterized as "dues" to the Bronx Organization if Poll Worker-2 wanted to continue working as a poll worker during early voting. This was the first time Poll Worker-2 had been told Poll Worker-2 had to pay to be a poll worker. (PSR ¶ 23).

Poll Worker-2 agreed to pay because Poll Worker-2 needed the money and enjoyed working as a poll worker. As a result, on or about August 12, 2020, Poll Worker-2 went to the NYC-BOE office where the defendant worked and gave the defendant a $150 money order written out to the Bronx Organization. Poll Worker-2 believed this payment guaranteed Poll Worker-2 one year of work. (PSR ¶ 23).

The following year, on or about May 19, 2021, Poll Worker-2 gave a $150 money order to another district leader ("District Leader-2"), who was collecting payments on behalf of the defendant. District Leader-2 reported that that the defendant was a "bully" who wanted to put fear in people's eyes and screamed at poll workers. As a result, District Leader-2 agreed to accept payments on behalf of the defendant and enforce the $150 requirement because District Leader-2 wanted to avoid conflict with the defendant and serve as a buffer between the defendant and District Leader-2's poll workers. On or about May 25, 2021, District Leader-2 texted the defendant to ask if she wanted Poll Worker-2's "money" or if she wanted to "wait till after the election." In response, the defendant said that she wanted the money "today," so District Leader-2 told the defendant to "come get it." On or about July 22, 2021, the money order that Poll Worker-2 gave to District Leader-2 was deposited into the defendant's bank account (the "Torres Bank Account"). Before it was deposited, the defendant altered the payee line from "Bronx [Organization]" to "Bronx Nicole T.O.R.RES," as shown in paragraph 23 of the PSR. (PSR ¶ 23).

In November 2021, the defendant called Poll Worker-2 and told Poll Worker-2 not to discuss "county pay rates," which Poll Worker-2 understood to be a coded reference to the "dues" payment. This was not the only poll worker that the defendant personally contacted about not discussing the poll worker kickback scheme. For instance, in 2023, the defendant made a phone call to another poll worker ("Poll Worker-5"), who started working as a poll worker at some point between 2012 and 2015. On that phone call, the defendant accused Poll Worker-5 of telling members of another political party about the $150 payment. When Poll Worker-5 denied the accusation, the defendant said she would look into it and whether Poll Worker-5 had paid $150 or had obtained signatures on petitions for candidates that the Bronx Organization supported. Presumably because Poll Worker-5 had made the required payment, the defendant called Poll Worker-5 back and told Poll Worker-5 that Poll Worker-5 could work.

*Poll Worker-3 and Poll Worker-4*

Text messages from the defendant's phone show her repeatedly telling other poll workers about the required $150 payment. For example, on October 29, 2020, a poll worker ("Poll Worker-3") asked the defendant, "do we have to pay u again"? In response, the defendant confirmed that a $150 payment "secures ur spot." (PSR ¶ 24).

Similarly, on or about October 6, 2020, a poll worker ("Poll Worker-4") texted the defendant, "Did you put my friend in a class for early voting ?" The defendant responded, "Is she paying $150?" After Poll Worker-4 said yes, the defendant confirmed that she would make Poll Worker-4's friend a poll worker and reiterated that the friend "has to give the 150." In addition, on August 3, 2021, District Leader-2 asked the defendant what to do about a particular man ("Male-1"). In response, the defendant said to "put him in [r]ather then someone else" but "[h]e gotta pay 150." District Leader-2 confirmed that the defendant's statements reflected the fact that the defendant was going to allow Male-1 to work as a poll worker only if he paid $150. (PSR ¶ 24).

*The Proceeds of the Poll Worker Kickback Scheme*

Between 2019 and 2024, the defendant personally received at least approximately $29,770 from poll workers. The defendant received the bribe payments in two ways. First, poll workers directly sent the defendant payments via mobile payment applications, including Zelle and Cash App. Second, poll workers wrote money orders and checks to the Bronx Organization, which the defendant deposited into the Torres Bank Account. In certain instances, the defendant deposited checks or money orders into the Torres Bank Account that were made payable to the Bronx Organization. In other instances, the defendant altered the payee line on the check, just as she had done with the $150 money order payment from Poll Worker-2. The Bronx Organization also collected at least $44,400 from the scheme. (PSR ¶¶ 25-26).

### D. The Poll Worker "No Show" Scheme

From at least 2018 through August 2024, the defendant participated in another scheme in which she and others conspired to sign in individuals as having worked as poll workers when those individuals had not actually worked as poll workers. The defendant and her co-conspirators then collected those individuals' salaries and split the money among themselves.[2] (PSR ¶ 27). Text messages and bank account analysis show that the defendant worked with at least four others, including two of her own family members, to pull off the "no show" scheme, and that the defendant and these co-conspirators—including her family members—shared in the profits together. The defendant and her co-conspirators frequently used the same individuals' names as the "no show" poll workers whose salaries they collected.

---

[2] In her letter, the defendant stated that she conspired with other elected district leaders as part of the "no show" scheme. (Def. Ltr. at 7). The Government is not aware of other elected district leaders participating in the "no show" scheme.

The defendant's text messages with her co-conspirators are rife with examples of them working together to sign in these "no show" poll workers. For example, on or about December 13, 2020, the defendant texted one of her relatives ("CC-1"), who worked as a poll site coordinator at relevant times, "U wanna sign [Male-2] in and we split it?" CC-1 responded, "Yea we can." The defendant followed up with CC-1 later the same day, asking, "Did you sign [Male-2's] name?" CC-1 responded, "Yes." CC-1 later texted the defendant, on or about December 15, 2020, "Where should I sign [Male-2] . . . In one of the open spots or the end?" The defendant did not answer, at least via text message. Later, on or about December 15, 2020, CC-1 texted the defendant, "I put my numbers for" four individuals, including Male-2, "[j]ust in case they try to check against attendance." In a later exchange on or about December 18, 2020, the defendant explicitly expressed concern about being caught. The defendant texted CC-1, "I don't want them to catch on to the people we signing in." Nevertheless, the defendant was undeterred and continued to work with her co-conspirators. On or about December 20, 2020, CC-1 told the defendant, "Ima sign [Male-2] in still . . . And sign the spot where the coordinator signs so I can sign the names in." (PSR ¶ 28).

The NYC-BOE paid Male-2 for his purported "work" via checks, and the defendant and CC-1 worked together to obtain the fraudulent payments. Specifically, CC-1 used and/or opened a bank account in the name of Male-2 (the "Male-2 Bank Account") to receive payments from the NYC-BOE and updated the defendant about the bank account. For example, on or about December 21, 2020, CC-1 texted the defendant, "[Male-2's] card came." CC-1 then asked Male-2 "[h]ow [t]o deposit the check." In response, the defendant explained to CC-1 how to set up direct deposit. The following month, the defendant asked CC-1, "Did [Male-2's] check hit the account on the card?" After CC-1 said no, the defendant directed CC-1 to "[c]heck [Male-2's] check." CC-1 responded, "Yea now it's there." Male-2's payment was eventually transferred to the Torres Bank Account. (PSR ¶ 28).

The defendant and her co-conspirators continued to falsely sign in Male-2 as having worked as a poll worker for years. For instance, on or about June 15, 2021, the defendant texted CC-1, "Will u be able to sign [Male-2]?" The defendant then sent CC-1 Male-2's poll worker number—a unique identifying number assigned to each poll worker for administrative purposes, such as payroll. The defendant then sent CC-1 the name of yet another individual ("Male-3") and his poll worker number. The defendant then instructed CC-1, "U and [CC-3] have to meet at the board in the back to sign the books." CC-1 responded, "Kk." The defendant then told CC-1, "Both of ya plz hurry imma pay ya last." The defendant followed up, asking if CC-1 was "coming to sign," and CC-1 said yes and that CC-3 was right behind CC-1.

As another example, on or about October 31, 2020, the defendant texted CC-1, in substance and in part, "If they call and ask u if [Male-4] was there yesterday and [Male-5] say . . . [y]es." CC-1 responded, "Kk." The defendant continued, "Say [Male-4] left early today and [Male-5] said he was working today . . . So he didn't come in." The NYC-BOE paid Male-4 for his supposed "work" via checks. For instance, NYC-BOE records show that, on or about November 13, 2020, the NYC-BOE authorized a check in the amount of $2,550, made payable to Male-4 for his supposed work in the October 2020 election. Records associated with a bank account in the name of another of the defendant's relatives ("CC-2") show that, on or about November 13, 2020, a check from the NYC-BOE made payable to Male-4, in the amount of approximately $1,771.96

was deposited into CC-2's bank account.  Two days later, CC-2 sent the defendant approximately $885 via Zelle—roughly half of what CC-2 received from Male-4's "no show" work.

Similarly, text messages between the defendant and CC-2 show that, on or about June 14, 2021, the defendant texted CC-2, "Do u want me to put [Male-4] at ur site?"  CC-2 responded, "U have to pay him I can't sign him I can't I signed for [Male-6]."  Records from the NYC-BOE's payroll system—to which the defendant had access in her role with the NYC-BOE—show that the defendant logged Male-4 as having worked five days of early voting during the June 2021 election. NYC-BOE records show that, on or about June 25, 2021, the NYC-BOE authorized a check in the amount of $1,400, made payable to Male-4 for his supposed work in the June 2021 election.  On or about June 25, 2021, a check from the NYC-BOE made payable to Male-4, in the amount of approximately $1,052.92, was deposited into CC-2's bank account.

From February 2019 through November 2021, the NYC-BOE issued approximately 15 checks to Male-4, totaling $15,025.50.  All of these checks were deposited into the CC-2's bank account.  With respect to at least seven of these checks, shortly after they were cashed, CC-2 made a payment to the defendant via Zelle, with the payment representing approximately half of the check on at least three occasions (consistent with the defendant and CC-2 having split the check 50/50) and a third on one occasion (consistent with the defendant, CC-2, and a third co-conspirator having split the check in equal parts).

Consistent with these instances, Poll Worker-4 admitted to law enforcement that, in or about March 2021, Poll Worker-4 and the defendant worked together to sign in two individuals as having worked as poll workers during a March 2021 election when they had not worked.  Poll Worker-4 further admitted that Poll Worker-4 and the defendant split the "no show" salaries between themselves.  Text messages between Poll Worker-4 and the defendant corroborate those admissions.  On or about March 13, 2021, Poll Worker-4 texted the defendant, "I need the addresses for the 2 ppl so I can sign them in."  The defendant responded by sending Poll Worker-4 the names of the two people—one of whom was Male-4—they falsely signed in, along with an address for each of them.  After those two individuals were falsely signed in, the NYC-BOE issued checks to those two individuals for their supposed work—one of which was deposited into the Torres Bank Account and the other which was deposited into a bank account of a co-conspirator, who later sent the defendant money via Zelle.  (PSR ¶ 29).

Poll Worker-4 also admitted that, in or about March 2021, she worked with the defendant to sign in yet another individual ("Male-7") as a poll worker, even though Male-7 did not actually work as a poll worker.  Poll Worker-4 received a $2,250 check for Male-7's purported "work" as a poll worker, and Poll Worker-4 paid the defendant a $200 cut of that money.  Male-7 originally did not know that Poll Worker-4 and the defendant had used his name in their scheme, but Poll Worker-4 eventually explained to Male-7 that Poll Worker-4 had used Male-7's name.  Male-7 was upset that his name had been used this way and asked Poll Worker-4 never to use his name again.

The defendant's text messages also show the lengths to which she and her co-conspirators went to cover up their fraudulent activity.  For example, on or about March 14, 2021, the defendant and CC-1 had a text exchange in which they discussed how sloppy CC-2 (who is related to both the defendant and CC-1) was being in signing in "no show" workers.  CC-1 texted the defendant,

6

"[CC-2] signed in all the wrong places . . . I left you a space on the third box of the page where she signed [Male-7's] name . . . Messed the whole thing up." CC-1 continued, "Hand writing is the same," to which the defendant responded, "[CC-2 is] stupid."

Indeed, the defendant went so far as to involve one of her adult children in the scheme to help cover her and co-conspirators' tracks. For instance, on or about February 14, 2024, the defendant texted CC-3, asking, "Who was at ur site." When CC-3 responded by asking the defendant for clarification, the defendant explained that she needed that information so she could "sign them in" and asked CC-3 to "hurry." CC-3 responded by listing three names and stated, "I signed the[ir] name[s] on my sign in sheet." When CC-3 followed up with the defendant the next day by asking if they were "good," the defendant told CC-3, "Yes I made [defendant's child] sign them in because I didnt want them to notice my hand writing." (PSR ¶ 30). On another occasion in April 2024, the defendant had that child run down from their home to deliver checks made out to two of the "no show" workers to CC-3.

As to the "no show" poll worker scheme's proceeds, the defendant and her co-conspirators profited at least $149,845.59 in total from the scheme, with Torres personally obtaining at least $11,200.07. (PSR ¶ 31).

## II.    The Defendant's Plea and Guidelines Range

On August 22, 2024, a grand jury sitting in this District returned Indictment No. 24 Cr. 499, charging the defendant in seven counts: (1) conspiracy to commit extortion under color of official right, in violation of 18 U.S.C. § 1951 (Count One); (2) extortion under color of official right, in violation of 18 U.S.C. §§ 1951 and 2 (Count Two); (3) conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349 (Count Three); (4) honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, 1349, and 2 (Count Four); (5) conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349 (Count Five); (6) mail fraud, in violation of 18 U.S.C. §§ 1341 and 2 (Count Six); and (7) aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2 (Count Seven). (PSR ¶¶ 1-8).

On April 17, 2025, the defendant pleaded guilty to Counts One and Five of the Indictment pursuant to a plea agreement dated March 7, 2025 (the "Plea Agreement"). (PSR ¶ 10). Pursuant to the Plea Agreement, the defendant's base offense level for Count One is 14 pursuant to U.S.S.G. § 2C1.1(a)(1) because she was a public official, and that level is increased by a total of 12 levels because the offense involved more than one bribe, the value of the bribe payments amounted to between $40,000 and $95,000, and the offense involved an elected public official. Under the Plea Agreement, the defendant's base offense level for Count Five is seven pursuant to U.S.S.G. §§ 2X1.1, 2B1.1, and 2B1.1(a)(1), and that level is increased by a total of eight levels because the loss was more than $95,000 but not more than $150,000. The combined offense level is 27, which includes a four-level enhancement because the defendant was an organizer or leader of criminal activity and a three-level reduction for acceptance of responsibility. While the defendant has two prior youthful offender convictions, including a 1999 conviction for attempted assault which resulted in one year of imprisonment, the defendant has zero criminal history points. Accordingly, under the Plea Agreement, the defendant's Guidelines range is 70 to 87 months' imprisonment (the "Guidelines Range").

The Probation Office agrees with the Guidelines Range in the Plea Agreement (PSR ¶¶ 41-69, 102), and the Probation Office recommends a sentence of 36 months' imprisonment and three years of supervised release. (PSR at 30). The defendant requests a sentence of five years of probation. (Def. Mem. at 1).

The defendant has agreed to pay $40,970.00 in forfeiture, which represents how much she personally earned from the two distinct schemes, and $149,845.59 in restitution to the New York City Department of Investigation's Finance Unit, which collects restitution payments on behalf of the victim in Count Five, the NYC-BOE. (PSR ¶¶ 113, 117). On April 18, 2025, the Court entered a preliminary order of forfeiture in the amount of $40,970.00. (Dkt. 34).

## III.    Discussion

### A.    Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant;
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also*

*Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

**B.      A Sentence of Imprisonment at the Bottom of the Guidelines Range Is Necessary and Appropriate in This Case**

A sentence of imprisonment at the bottom of the applicable Guidelines range of 70 to 87 months' imprisonment, would be sufficient, but not greater than necessary, to serve the purposes of sentencing in this case.

### i.  The Seriousness of the Offense and Need for Just Punishment

The seriousness of the defendant's conduct and the need for just punishment support imposition of a substantial sentence of imprisonment.  As both an elected district leader and a NYC-BOE employee, the defendant held positions of public trust.  The defendant abused those positions of trust for at least six years by leading two distinct, illegal schemes.

*First*, for years, the defendant personally demanded that poll workers pay her bribes in order to work as a poll worker.  She also recruited other district leaders and poll workers to do her dirty work and request payments from poll workers.  Other district leaders and poll workers fell in line, in part because the defendant bullied poll workers and in part because, through her position in the NYC-BOE poll worker department and as a district leader, the defendant controlled who could work and where they could work.  Unlike any of her co-conspirators, she personally profited from the scheme.  During her reign, at least over 100 poll workers paid bribes to the defendant or her co-conspirators.  While the bribe amount of $150 may seem modest at first glance, this money was often critical to poll workers who needed the money.  Eligible poll workers who could not or did not want to pay suffered the consequences and were not allowed to work.

The defendant seeks to minimize her role in the poll worker kickback scheme by claiming that "[t]he practice of collecting money from poll workers was going on for a long time and was widespread" and that "when I became district leader, I became part of it."  (Def. Mem. Ex. A at 1). However, the defendant fails to point to any evidence to support those self-serving claims.  First, the record demonstrates that the practice of demanding that poll workers pay to work began in 2019, which is when early voting began and when the defendant was elected a district leader.  Poll Worker-1 also stated that Poll Worker-1, who had never previously been asked about paying $150 to become a poll worker, was first contacted by the defendant about the $150 payment in 2019. Second, the defendant did not merely "bec[o]me part" of the kickback scheme.  She was a leader of the scheme, as is reflected by the application of a leadership enhancement in the Guidelines calculation set forth in the Plea Agreement.

*Second*, the defendant conspired with others—including her family members—to sign in individuals as poll workers who never actually worked and split the wages for those "no show" poll workers between herself and her co-conspirators.  The scheme only worked because the defendant was an insider: she could register "no show" poll workers for training classes and as poll workers, and then she had had access to poll worker lists and the NYC-BOE payroll system. This information was critical to the success of the scheme.  Without the poll worker lists, the

defendant and her co-conspirators would not have known who to sign in for the "no show" jobs. In addition, in an effort to cover up her illegal conduct, she recruited others—including her own child—to sign in names so that others would not notice the defendant's handwriting on sign-in sheets. Through this conduct, the defendant not only defrauded the NYC-BOE, but also ensured that polling sites lacked the requisite personnel on early voting and election days.

The defendant's conduct in these two schemes was not aberrational or reflective of a momentary lapse in judgment. She led these two schemes for years, even after already serving a term of imprisonment in her youth after committing attempted assault. The defendant repeatedly betrayed her constituents and her employer and abused the positions of trust that she held, all in order to enrich herself for years. From her participation in these two distinct schemes, the defendant pocketed at least over $40,000. And the manner in which she secured that cash for herself was particularly brazen—for example, by altering the payee line on multiple checks written out to the Bronx Organization so that she could deposit the proceeds of her corrupt scheme into her own bank account. This conduct demands a stern sentence, so that the American public knows that its government will not allow its officials to exploit their power in service of self.

To that point, courts in this District have repeatedly emphasized the harm caused when public employees engage in bribery and corruption offenses. For example, Judge Caproni observed in sentencing a public employee for a bribery offense that public corruption is "one of the most serious of all federal offenses" because "[t]his country cannot exist if the public does not trust that public officials are operating as servants of the people and not corruptly for their own personal gain." *United States v. Rupnarain*, No. 24 Cr. 125 (VEC), Dkt. 28 at 25 (S.D.N.Y. Aug. 5, 2024); *see also id.* at 26 ("I think society expects public corruption to be treated seriously and for corrupt officials to be punished."). Similarly, Judge Cote, in sentencing another public employee, explained that "corruption is a corrosive, destructive issue. People need to have faith in their government." *United States v. Figueroa*, No. 22 Cr. 605 (DLC), Dkt. 27 at 17 (S.D.N.Y. Feb. 9, 2023). In addition, in a recent bribery case involving corrupt Drug Enforcement Administration officials, Judge Oetken called bribery of public officials "insidious" because it "undermines the public's faith in our system," further explaining that:

> There are a lot of countries around the world where this sort of corruption is routine, it's part of life, everyone expects it. One of the things that sets our country apart, at least in our aspirations and our ideals, is to be free of this sort of corruption.

*United States v. Costanzo*, No. 22 Cr. 281 (JPO), Dkt. 253 at 54 (S.D.N.Y. Apr. 24, 2024).

The harm caused by the defendant's corrupt schemes is particularly serious because free and fair elections serve as a cornerstone of our democracy. One of the defendant's primary responsibilities as a district leader and an employee in the NYC-BOE poll worker department was the selection and placement of poll workers. Poll workers serve a critical role in ensuring the integrity of elections. They prepare poll sites for voters, assist voters during the voting process, close poll sites, report election results, and assist other poll workers as needed.[3] Through the "no show" scheme, the defendant and her co-conspirators ensured that polling sites did not have the

---

[3] Election Inspector, Board of Elections in the City of New York, *available at* https://www.vote.nyc/page/election-inspector (last visited Aug. 8, 2025).

number of poll workers needed to operate polling sites.  Through the kickback scheme, eligible poll workers were denied work simply because they did not want to pay bribes.  When the electoral process is undermined through corrupt schemes like the defendant's, the public may lose trust in its elected leaders and democratic institutions.

### ii.    The Need for Deterrence and To Promote Respect for the Law

A custodial sentence in line with the Government's recommendation is also vital to promote respect for the law and to deter others who may seek to engage in similar schemes to undermine the electoral process—a factor that would not be adequately addressed with the non-incarceratory sentence requested by the defendant.  Any sentence imposed in this case must send a message to those who seek to illegally profit from their elected and public positions that such conduct will not be tolerated and that serious consequences, including incarceration, will result.

The Second Circuit and courts in this District have recognized that public officials must be held to a higher standard and that they should suffer serious consequences when they seek to use their office for their own gain.  *See, e.g.*, *United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) (finding above-Guidelines sentence of former New York state senator of 60 months' imprisonment justified by district court's reasoning that "there has to be a sense that we give to the public that we are going to safeguard the integrity of our system . . . .  That we will hold our public officials to a higher standard . . . .").  As one court in this District explained when imposing an 84-month sentence on a state senator who paid bribes in an effort to obtain a nomination for New York City Mayor, in punishing such crimes: "the law takes into consideration the fact they they're public servants.  That's what makes the crime so serious.  It is that we are entitled to expect our public officials to only engage in selfless good deeds and to only legislate in the best interests of their constituents and to act in a way that is exemplary."  *United States v. Smith*, 13 Cr. 297 (KMK), Dkt. 461 at 21-22 (S.D.N.Y. July 1, 2015).

The defendant appears to suggest that the fact that the "kickback scheme was widespread" supports a non-incarceratory sentence.  (Def. Mem. at 6).  If anything, the rampant nature of the defendant's corrupt scheme is an argument in favor of the need to deter criminal conduct through a serious sentence.

### iii.    The History and Characteristics of the Defendant

While the Court can and should consider the significant personal and familial challenges that the defendant faced during her childhood, the fact that the defendant appears to be a primary caregiver to one of her children, and the pride the defendant felt when she finally secured a job with the NYC-BOE, those factors do not justify a non-incarceratory sentence.

With respect to her family, the defendant's submission overlooks the fact that she repeatedly involved her family members, including one of her adult children, in her corrupt schemes.  For instance, it seems to have been through the defendant's role as a public official and NYC-BOE employee that her relatives—CC-1 and CC-2—gained and abused their authority over polling sites, enabling the defendant and her relatives to execute the "no show" scheme.  And most egregiously, the defendant appears to have used her own child to advance that scheme.  Although the Government does not doubt that child's love and concern for the defendant, the defendant's indifference to involving her child in her criminal conduct—including by having her child forge

11

others' signatures—calls into question the assertions in her child's letter casting the defendant as someone who "put[s] her children first." (Def. Mem. Ex. B at 1).

The defendant's letters of support also appear to be contrary to the defendant's prolonged and brazen conduct in the two distinct schemes described above. For example, one letter states that the defendant is "the kind of person who would give her last dollar to help someone else." (Def. Mem. Ex. B at 1). That claim simply cannot be squared with the defendant's repeated demand that Bronx residents pay $150 in order to be a poll worker. That claim also cannot be squared with the fact that the defendant barred Poll-Worker-1—who relied on the poll worker salary to supplement a part-time job—from working because Poll Worker-1 refused to pay. Another of the defendant's letters of support describes the defendant as a hard worker at the NYC-BOE who supported others. (Def. Mem. Ex. C at 1). However, she also used her time at the NYC-BOE for unlawful ends. And she did so not through support for her co-workers but, at least as another district leader described it, by being a "bully" and screaming at the poll workers from whom she was demanding bribes.

Finally, as the defendant seems to recognize, while obtaining her job at the NYC-BOE and being elected a district leader were significant accomplishments, she quickly "got carried away" with her "position and self-importance." (Def. Mem. Ex. A at 1). Instead of appreciating how far she had come and living up to the high bar set for public servants, the defendant quickly used the unique information and opportunities with which she was entrusted as a public employee and elected official to abuse her power. During the sentencing of a law firm partner for a multi-year mail fraud scheme in which the defendant defrauded his firm and clients, one district court judge noted that it was "precisely the defendant's mantle of integrity and benevolence that serve[d] as cover for an invidious end," *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009). Put differently, she used her newly gained power and the public's trust to bully others and line her own pockets. In that context, it would be perverse for the defendant to seek leniency based on the same achievements that laid the foundation for her crimes.

### iv. The Defendant's Remaining Arguments in Favor of a Non-Incarceratory Sentence Should Be Rejected

The defendant raises three other arguments to support her request for a sentence of probation. Each should be rejected.

*First*, the defendant argues that she has already suffered numerous consequences that constitute just punishment. (Def. Mem. at 8). According to the defendant, she has already lost her job and her livelihood, has "been publicly disgraced and humiliated," and has suffered mentally from knowing the impact her conduct will have on her children. (*Id.*). However, these consequences are not unique to the defendant and are natural consequences that flow from committing a crime during the course of her work as a public employee and public official. One would expect that a defendant who commits fraud while at work would be fired and lose her income. While the Government acknowledges that the Court should consider the fact that defendant is a primary caregiver to one of her children, the defendant was undoubtedly aware of the consequences of participating in two, multi-year corrupt schemes. Indeed, as to that argument in particular, the Government notes that the defendant and her co-conspirators used the name of her child's father as one of the "no show" poll workers. That is, the defendant was undeterred by

the possible consequences that involving her child's father in her own criminal scheme might have on her child's life—a fact that unfortunately marshals against now crediting the defendant's argument that she must avoid prison in order to care for her child.  It is unfortunately quite common for those who commit serious offenses to have young children.  *See, e.g.*, *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."); *United States v. Zadora*, 93 F. App'x 305, 306-07 (2d Cir. 2004) (quoting *id.*).

The defendant also states that she had many co-conspirators, yet she is the only one who was charged and, therefore, the only one responsible for the financial consequences of her conduct.  (Def. Mem. at 8).  While this is true, this argument overlooks the fact that the defendant is also the only person who personally financially benefited from the kickback scheme and that she was a leader of both corrupt schemes.

*Second*, the defendant states that her medical and mental conditions warrant a non-incarceratory sentence.  However, the defendant fails to demonstrate that the Bureau of Prisons will be unable to treat the defendant, and courts in this district have sentenced defendants to significant terms of imprisonment despite physical ailments.  *See, e.g.*, *United States v. Kolfage*, No. 20 Cr. 412 (AT) (S.D.N.Y. 2023) (disabled defendant who lost three limbs while serving in military sentenced to 51 months' imprisonment for fraudulent fundraising campaign).

*Third*, the defendant states that a non-incarceratory sentence is necessary because of the need to avoid unwarranted sentencing disparities.  (Def. Mem. at 10-11).  The defendant claims that she was "not a high-ranking public official," that she had no intention to undermine the election process, and that her conduct "is substantially less egregious in terms of abuse of power, public harm, and financial loss."  (*Id.*).  These claims appear to overlook the seriousness of the defendant's illegal conduct in two illegal schemes over several years.  Moreover, whether or not the defendant intended to undermine the integrity of elections, her conduct unfortunately has such an impact by undermining the public's trust in its public servants.  When public servants or elected officials engage in corruption offenses, even when they are not the most high-ranking officers, courts in this District have imposed incarceratory sentences.  *See, e.g.*, *United States v. Whitehead*, No. 22 Cr. 692 (LGS) (S.D.N.Y. 2024) (former church leader sentenced to nine years' imprisonment for engaging in several fraud schemes, including stealing from parishioners); *United States v. Smith*, No. 13 Cr. 297 (KMK) (S.D.N.Y. 2015) (former state senator sentenced to seven years' imprisonment for bribing New York City party leaders so that the state senator could run for mayor); *United States v. Costanzo*, No. 22 Cr. 281 (JPO) (S.D.N.Y. 2024) (DEA special agent sentenced to four years' imprisonment for participation in a bribery scheme); *United States v. McGonigal*, No. 23 Cr. 16 (JHR) (S.D.N.Y. 2023) (former FBI special agent in charge sentenced to 50 months' imprisonment for using special skills obtained while an FBI agent to violate Russian sanctions and commit money laundering); *United States v. Harris*, No. 24 Cr. 207 (LAK) (S.D.N.Y. 2024) (NYCHA superintendent sentenced to 41 months' imprisonment for soliciting approximately $54,150 in bribe payments).

## IV.    Conclusion

For the reasons set forth above, the Court should impose a sentence of imprisonment of at the bottom the Guidelines Range.[4]

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: _____/s/_____
Benjamin M. Burkett / Rebecca T. Dell
Assistant United States Attorneys
(212) 637-2455 / -2198

cc:    Counsel of Record (via ECF)

---

[4] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g., United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).